IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | CR No.: 3:04-657-JFA |
| ) | |
| v. ) | MEMORANDUM OPINION |
| ) | AND ORDER |
| PATRICK MAURICE THOMPSON ) | |
| _____ ) | |

This matter is before this court for additional action under the defendant's motion for immediate release pursuant to § 404(b) of the First Step Act of 2018.[1] and the Fair Sentencing Act of 2010.[2]

## PROCEDURAL HISTORY

The defendant, Patrick Maurice Thompson, is one of seven defendants named in an 11-Count Third Superseding Indictment issued in 2004. On October 25, 2005, the defendant entered into a standard written plea agreement agreeing to plead guilty to Counts 3, 10, and 11, which charged the following:

Count 3:   Conspiracy to Possess with Intent to Distribute and Distribution of 50 Grams or More of Cocaine Base, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A), § 846

Count 10:  Using and Carrying a Firearm During, in Relation to, and in Furtherance of, a Crime of Violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and (ii), and

Count 11:  Using and Carrying a Firearm During, in Relation to, and in Furtherance of, a Crime of Violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i), (ii), and (iii)and 2.

---

[1] Pub. L. 115-015 (S. 756), 132 Stat. 015 (enacted Dec. 21, 2018).

[2] Pub. L. 111-220; 124 Stat. 2372 (2010).

1

At a hearing held on April 21, 2006, this court sentenced the defendant to 646 months incarceration, consisting of 262 months on Count 3, 84 months on Count 10, and 300 months on Count 11. The sentences on Counts 10 and 11 were ordered to run consecutive to each other and to Count 3.

In March 2008, this court granted the government's motion and reduced the defendant's sentence to 300 months. After the First Step Act of 2018 was passed, the defendant filed a motion with this court seeking relief as to his sentence pursuant to § 404(b), (ECF No. 674). In an order filed on September 30, 2019 (ECF No. 687), this court granted the defendant's motion, recalculated the defendant's Guidelines in light of the intervening First Step Act, and resentenced the defendant to a custodial term of 269 months. In that order, this court declined to consider non-retroactive intervening changes in sentencing law that had been put in place since the defendant's initial sentencing.

Thereafter, the Fourth Circuit Court of Appeals affirmed in part, vacated in part, and remanded the case back to the District Court.[3] With the consent of the government, the Fourth Circuit determined that because this court did not have the benefit of *United States v. Lancaster,* 997 F.3d 171 (4th Cir. 2021), and *United States v. Chambers*, 956 F.3d 667 (4th Cir. 2020), this court reversibly erred in failing to address the defendant's non-frivolous challenge to his career offender designation when deciding his First Step Act motion.

---

[3] *United States v. Thompson*, No. 19-7586, 2021 WL 4521111 (4th Cir. Oct. 4, 2021).

After the matter was remanded to this court, the United States Supreme Court issued its decision in *Concepcion v. United States*, 142 S.Ct. 2389 (2022). After *Concepcion* was handed down, this court allowed the parties to brief the significance of this decision on the matter pending before the court.

The parties agree that *Concepcion* overruled prior Fourth Circuit precedent, including *Lancaster* and *Chambers*, and altered the calculus to be employed by the court in deciding a First Step Act motion under §404(b). In short, *Concepcion* requires that district courts recalculate the Guidelines "as if the Fair Sentencing Act's amendments had been in place at the time of the offense." 142 S. Ct. at 2402 n.6. "The district court may then consider postsentencing conduct or nonretroactive changes [in the law] in selecting or rejecting an appropriate sentence, with the properly calculated Guidelines range as the benchmark." *Id.* District courts must, though, "consider intervening changes when parties raise them." *Id.* at 2396. Post-sentencing conduct includes mitigating (e.g., rehabilitation) as well as aggravating (e.g., violence or prison infractions) circumstances.

Although it "is well established that a district court must generally consider the parties' nonfrivolous arguments . . . a district court is not required to be persuaded by every argument parties make, and it may, in its discretion, dismiss arguments that it does not find compelling without a detailed explanation." *Id.* at 2404. A district court is not "required to articulate anything more than a brief statement of reasons" that make clear it reasoned through the parties' arguments. *Id.*

"Put simply, the First Step Act does not require a district court to accept a movant's argument that evidence of rehabilitation or other changes in law counsel in favor of a

3

sentence reduction, or the Government's view that evidence of violent behavior in prison counsels against providing relief. . . . All that is required is for a district court to demonstrate that it has considered the arguments before it." *Id*. at 2405.

With the framework established by *Concepcion* in mind, the court now turns to the sentencing issues presented on remand.

*Eligibility for Relief*

On May 14, 2019, the Federal Public Defendant's Office filed the present motion on behalf of the defendant. The United States Probation Office has prepared a Sentence Reduction Report ("SRR") and concludes that the defendant qualifies for a reduced guideline sentence and reduction in his term of supervised release. The government concedes that the defendant is eligible for a reduction of his sentence.

The defendant appears eligible for a reduction in his sentence under the First Step Act because his conviction in Count 3 no longer carries a statutory maximum of life sentence. If the Fair Sentencing Act of 2010 had been in effect at the time of the defendant's original sentencing, his statutory maximum on Count 3 would have been 40 years and his career offender guidelines would have been based on a total offense level of 31, criminal history category VI, which would have resulted in a Guideline range of 188 to 235 months. With the addition of the 384 months consecutive on counts 10 and 11, Thompson's range would have been 572 to 619 months.

Had the Fair Sentencing Act been in effect, the government suggests that the court would have sentenced the defendant to 188 months on Count 3, plus 384 months consecutive on Counts 10, 11, for a total sentence of 572 months.

4

The defendant received a sentence reduction on March 19, 2008, which reduced his total sentence from 646 months down to 300 months—a reduction of approximately 53%. As the government notes, if the court were to grant a reduction pursuant to the instant motion, a similar reduction of 53% from 572 months would be 269 months.

This new Guideline range serves as the "anchor" for this sentencing proceeding. "The district court may then consider postsentencing conduct or nonretroactive changes in selecting or rejecting an appropriate sentence, with the properly calculated Guidelines range as the benchmark." *Concepcion v. United States*, 142 S. Ct. 2389, 2402 n.6 (2022).

*Intervening Changes in Sentencing Law*

Sentencing law has changed in three significant ways since the defendant's sentencing in 2006. First, the government concedes that the defendant would no longer be considered a career offender under the United States Sentencing Guidelines ("U.S.S.G"). But, the government argues that the change is not significant because even without the career offender enhancement, the defendant's criminal history category would still be VI instead of V, as asserted by the defendant.

Of the 15 total criminal history points originally ascribed to the defendant, the Presentence Report (PSR) (ECF No. 673) assessed one criminal history point for the defendant's prior conviction for failure to comply with a police command, and two criminal history points for a stolen pistol conviction. The defendant argues that these convictions are part of the relevant conduct of his drug conspiracy offense, because they are discussed in the "Offense Conduct" section of the PSR.

Additionally, the defendant charges that one history point assigned to him under the so-called "Recency" provision that has since been removed by U.S.S.G. Amendment 742, a change which was not deemed to be retroactive according to the government. Thus, argues the defendant, his correct criminal history point total is 11, which places him in a criminal history category of V.

The government argues in response that the conduct underlying the failure to comply, and the stolen pistol convictions are not charged in the Counts of the Indictment, nor are they relevant conduct. The government suggests that it is untenable to argue that any conduct mentioned in the "offense conduct" section of the PSR is relevant conduct or part of the instant offense. This court agrees and finds that the defendant would still be assessed the three criminal history points associated with these prior offenses.

Even when removing the single point assigned under the recency provision, the defendant would still have 14 criminal history points, thus earning him a criminal history category of VI (13 or more points).

However, removal of the career offender designation would reduce the defendant's base offense level from 34 to 30. When accounting for the 3-level decrease for acceptance of responsibility, the defendant's final offense level would be 27.

Second, the defendant argues that he should not have been sentenced for his first § 924(c) conviction under the sentencing range for "brandishing" a weapon. At the time of the defendant's sentencing, a conviction under § 924(c) received a sentence of 5 years imprisonment, plus 2 additional years if the firearm was "brandished." In *Alleyne v. United States*, 570 U.S. 99 (2013), the Supreme Court held that a determination as to whether a

firearm was brandished or discharged for purposes of 18 U.S.C. § 924(c) must be determined by a jury. In *Apprendi v. New Jersey*, the Supreme Court held that the Sixth Amendment right to a jury trial means that any fact that led to a sentence longer than the maximum spelled out in the statute must be found by a jury. 530 U.S. 466 (2000).

Here, at the defendant's guilty plea colloquy, the court did not specifically address whether brandishing the firearm was an element of the crime. Accordingly, when accounting for intervening changes in the law, a two-year enhancement for brandishing would likely be improper based on the current record.

Third, and perhaps most importantly, there has been a significant change in the law as to the so-called "stacking" of § 924(c) convictions. The defendant's "second or subsequent" § 924(c) violation alleged in Count 11 is much harsher than it would be if the defendant were sentenced today.

At the defendant's sentencing, the second § 924(c) stacking enhancement led to a 25-year sentence on that Count 11. However, the First Step Act significantly changed the stacking regime. Specifically, in § 403 of the First Step Act of 2018, Congress amended 18 U.S.C. § 924(c) to provide that the 25-year (300 months) consecutive term for successive § 924(c) offenses does not apply unless a defendant had a previous, final conviction for a § 924(c) charge at the time of the offense. This effectively did away with the so-called "stacking" procedure. Consequently, if sentenced today, the defendant would be subject to a consecutive sentence of only five years as opposed to 25 years, for his conviction of Count 11.

The government responds to this argument by suggesting that the anti-stacking provision of the First Step Act is expressly deemed to be non-retroactive. This begs the question, however, because as noted above, *Concepcion* gives this court the authority to consider this change in the law when addressing the defendant's motion.

If sentenced under today's laws, the defendant would face a sentencing range of 130 to 160 months (criminal history VI and offense level 27) for Count 3. When accounting for the 22-year discrepancy for the § 924(c) counts discussed above (2 years for the erroneous brandishing enhancement and 20 years for the now-repealed mandatory stacking regime), the defendant would ultimately face a guidelines range of 250 to 280 months. Although speculative given the drastically different sentencing range under toady's sentencing regime, if this court were to apply the same 53% reduction in the defendant's sentence as a result of his cooperation pursuant to Fed. R. Crim. P. 35(b), (which is consistent with this Court's prior order granting Thompson's First Step Act motion, *see* ECF No. 687 at 3-4) the resulting range would be 118 to 133 months.

The government avers that Thompson should not receive the benefit of non-retroactive changes in sentencing law over and above the reduction due pursuant to §404(b). Thus, the court should consider a sentencing range of 242 to 257 months which represents the reduced offense level of 27, a criminal history category of VI, along with 32 years of consecutive § 924(c) terms (7 for brandishing and 25 for a consecutive stacked conviction) and a 53% reduction pursuant to Rule 35(b). The government finally suggests that a sentence of 257 months is appropriate.

However, Thompson argues that a 242-month sentence—which is the bottom of the highest possible Guidelines range—is a 27 month reduction in sentence from Thompson's current sentence. Thompson is currently scheduled to complete his federal sentence on April 29, 2024, which is approximately 20 months from the date of this order. Thus, Thompson contends that a sentence of time served is more than appropriate.

In sum, if the defendant were sentenced today under current sentencing law, his sentence would be significantly lower than the one in imposed in 2006. Although the defendant's criminal history category would remain at VI, the fact remains that the *Apprendi* issue could reduce the defendant's sentence by as much as 24 months, and the non-retroactive, anti-stacking provision of the First Step Act could reduce the defendant's sentence by an additional 20 years. So, intervening changes in the law weigh significantly in the defendant's favor in terms of a reduced sentence over and above of that mandated by §404(b).

*Post-Sentencing Conduct*

The court's inquiry does not end here, however.  The court must also take into account the defendant's post-sentencing conduct.  Commendably, the defendant has taken a total of 59 educational and vocational courses while incarcerated.  He has also completed his GED.

On the other side of the ledger, the defendant has accumulated a significant number of disciplinary infractions while at the BOP.   Those infractions include the following:

- 11-07-2017     201: Fighting with Another Person
- 09-28-2017     201: Fighting with Another Person

9

- 10-26-2016   297: Phone Abuse-disrupt Monitoring

- 03-03-2016   104: Possessing a Dangerous Weapon

- 05-26-2015   307: Refusing to Obey an Order

- 10-24-2014   101: Assaulting w/Serious Injury and 104: Possessing a Dangerous Weapon

- 10-03-2013   224: Assaulting W/o Serious Injury

- 04-06-2010   205: Engaging in Sexual Acts

- 07-29-2009   201: Fighting with Another Person

- 03-04-2009   205: Engaging in Sexual Acts

- 12-24-2008   224: Assaulting W/o Serious Injury

"The First Step Act does not require a district court to accept a movant's argument that evidence of rehabilitation …, or the Government's view that evidence of violent behavior in prison counsels against providing relief. . . . All that is required is for a district court to demonstrate that it has considered the arguments before it." *Concepcion v. United States,* 142 S. Ct. 2389, 2405 (2022).

Accordingly, the court has considered defendant's evidence of rehabilitation along with the government's evidence of disciplinary infractions and determines that neither outweighs the other in favor of or against a sentence reduction.

### *§3553(a) Factors*

The court will also briefly address the sentencing factors set out in 28 U.S.C. § 3553(a).

1. *Nature and Circumstances of the Offense*. The investigation in this case reveals that defendant, along with several others, purchased powder and crack cocaine from sources in Atlanta and New York City. After returning to the Chester, South Carolina are, some of the defendants cooked the powder into crack and the defendant thereafter sold or fronted crack cocaine to various individuals. According to the investigation, members of the conspiracy systematically engaged in acts of intimidation, violence, and drug robberies to establish themselves and to maintain their narcotics trafficking activities.

The following are verbatim portions of the defendant's PSR:

16. Government witness Gerald Carlos Watkins provided historical information about Thompson. According to Watkins, on April 28, 2004, he rode with Dentavious Williams to Chester, South Carolina, because he was interested in purchasing a pit bulldog from Marcus Bowser. On the way there, Watkins found out Williams had arranged for a drug transaction with Bowser to take place in Chester, South Carolina, for the purchase of a "Big 8" of crack cocaine. When Williams and Watkins arrived in Chester at the prearranged location, Bowser was not there, and Edward Gore was waiting for them. Edward Gore directed them to a cinder block shack and told them he would be handling the drug transaction for Bowser. Watkins told Edward Gore he had $2,500 to purchase the pit bulldog. When they entered the shack, Edward Gore pointed a gun to Watkins' head. Patrick Thompson entered the residence, pointed a gun at Watkins, and stated, "Give it up or lay down! If you say anything, I'll kill you! You know how I roll." Watkins indicated that, while Bowser held Williams at gunpoint, Edward Gore and Thompson robbed him. Watkins estimated that, in all, Edward Gore, Thompson, and Bowser robbed him and Williams of approximately $3,450. According to Watkins, when he saw Edward Gore at a local Rock Hill Mall shortly after the robbery, Edward Gore ran from him. Watkins also reported that, shortly after the robbery, he confronted Bowser and demanded a return of the stolen money. Bowser told Watkins the robbery was Thompson's idea.

17. According to an incident report prepared by the Chester Police Department, on May 22, 2004, Thompson was operating a 1989 Ford Crown Victoria when he was stopped at a public safety check point. Officers searched the vehicle and found a loaded Ruger semi-automatic pistol, as well as a loaded Hi-Point pistol. Thompson acknowledged he owned both firearms.

18. On May 25, 2004, Anthony Starr was shot in the chest during an armed home-invasion style drug robbery at Starr's residence at 303 Cherry Road, Rock Hill, South Carolina. Starr survived the shooting and was interviewed. According to Starr and other witnesses, immediately prior to the shooting, Thompson walked by Starrs's residence and failed to acknowledge Starr when he said "hello." A shell casing was recovered from the crime scene and admitted into evidence. This shell casing was later matched to a Hi-Point pistol seized from a rental car on June 24, 2004, in which Thompson was an occupant. Thompson admitted ownership of the firearm.

19. On June 24, 2004, Carlos Watkins, Dentavious Williams, and Eric Mitchell assaulted Marcus Bowser in the vicinity of Cherry Road in Rock Hill, South Carolina. Later on that evening, police dispatch received numerous reports that Thompson was operating a tan Chevrolet pick-up truck, that he was armed, and was looking to kill an individual with whom he had had a conflict. Later that evening, officers located the pickup truck and observed five individuals in the vehicle. When the officer conducted a traffic stop, he identified the occupants as Thompson, Bowser, Anthony Chalk, Marques Baxter, and Debsharria Foster. When the officer searched the vehicle, he discovered two loaded firearms, a Hi-Point .380 caliber revolver and a Smith and Wesson .38 caliber revolver, as well as some drug paraphernalia. The shell casing recovered from the Starr shooting on May 25, 2004, was later determined to have come from the same Hi-Point .380 caliber revolver found in the pick-up truck. Thompson admitted possession of both firearms after he was given his Miranda Rights. Thompson also told authorities he was present during the drug-related robbery of Carlos Watkins. On that same evening, officers executed a search warrant at a residence located at 1109 McAfee Street, York, South Carolina. Officers had received information from a source that Patrick Thompson had moved into the residence, and Bowser had come to visit him. The source told officers that Bowser placed his belongings in the back bedroom of the residence when he arrived. During the search, officers located a bag that contained suspected crack cocaine in the back bedroom among Bowser's belongings. The suspected drugs were forwarded to the SLED Forensic Laboratory for analysis and tested positive for crack cocaine in the amount of 9.76 grams.

(ECF No. 673-1 at 7, 8).

2. *History and Characteristics of the Defendant.* The defendant was born in 1977 and never knew his father. He was raised by his mother in Rock Hill, South Carolina. The

defendant grew up in a high crime environment in the Chester, South Carolina community. The defendant reported that his mother was a crack cocaine addict while he was growing up. According to the PSR, the defendant related that at age 14 he began selling crack cocaine as a means of survival. The PSR indicates no significant medical or mental health issues.

3. *Seriousness of the Crimes*. As noted herein, the court regards the defendant's crimes as very serious and are fully supportive of a significant sentence.

4. *Whether the Sentence Promotes Respect for the Law and Just Punishment for the Offense*. The court finds a significant sentence is necessary to promote respect for the law and just punishment.

5. *Whether the Sentence Affords Adequate Deterrence to Criminal Conduct*. The court finds that a significant sentence is necessary to provide both general and specific deterrents.

6. *Whether the Sentence Protects the Public from Future Crimes of the Defendant*. The court finds that a significant sentence is necessary to protect the public from future crimes of the defendant.

7. *Need to Avoid Unwarranted Disparity*. Viewing the defendant's sentence as compared with the culpability of the defendant and his associates, his imposed sentence was and is in line with the other co-defendants.

## CONCLUSION

When considering all of the above, the defendant is no doubt entitled to some relief pursuant to §404(b) after having calculated the now applicable Guidelines. Furthermore,

13

the "First Step Act allows district courts to consider intervening changes of law or fact in exercising their discretion to reduce a sentence pursuant to the First Step Act." *Concepcion v. United States*, 142 S. Ct. 2389, 2404 (2022). Here, the court is persuaded by the drastic disparity in Thompson's would-be sentence under today's sentencing laws compared to that received in 2006. Accordingly, the court will grant the defendant's motion. (ECF No. 674).

Considering all of the information outlined above, the court concludes that the custodial portion of the defendant's sentence is reduced to time served as to each count: that being Counts 3, 10, and 11.[1] Additionally, the defendant's term of supervised release is reduced from 5 years to 4 years. In all other respects, the original sentence remains in full force and effect, including all the conditions of supervised release. Enforcement of this order is stayed for 10 days from the date of entry to allow the BOP to administratively process defendant's release.

IT IS SO ORDERED.

August 18, 2022  
Columbia, South Carolina

Joseph F. Anderson, Jr.  
United States District Judge

---

[1] It should be noted that a reduction in sentence to time served will not result in Thompson's immediate release from incarceration. Instead, he should be transferred to the South Carolina Department of Corrections to finish serving a twenty-five-year sentence for voluntary manslaughter. He is not expected to complete that sentence until June 2028.